UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| TAMMY GENE BYASSEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:19 CV 219 ACL |
| | ) | |
| ANDREW M. SAUL, | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM</u>**

Plaintiff Tammy Gene Byassee brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration Commissioner's denial of her applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and Supplemental Security Income ("SSI") under Title XVI of the Act.

An Administrative Law Judge ("ALJ") found that, despite Byassee's severe impairments, she was not disabled as she had the residual functional capacity ("RFC") to perform work existing in significant numbers in the national economy.

This matter is pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).   A summary of the entire record is presented in the parties' briefs and is repeated here only to the extent necessary.

For the following reasons, the decision of the Commissioner will be affirmed.

**I.   Procedural History**

Byassee filed her applications for benefits on October 18, 2016.   (Tr. 167-74.)   She

claimed she became unable to work on June 22, 2016, due to major depression, anxiety, panic attacks, post-traumatic stress disorder ("PTSD"), congestive heart failure, chronic obstructive pulmonary disease ("COPD"), heart attack, high blood pressure, high cholesterol, neuropathy of the upper and lower extremities, herniated disc, pinched nerve, chronic back pain, glaucoma, and migraines.   (Tr. 204.)   Byassee was 49 years of age at her alleged onset of disability date.   Her application was denied initially.   (Tr. 95-101.)   Byassee's claim was denied by an ALJ on November 23, 2018.   (Tr. 10-21.)   On October 1, 2019, the Appeals Council denied Byassee's claim for review.   (Tr. 1-4.)   Thus, the decision of the ALJ stands as the final decision of the Commissioner.   *See* 20 C.F.R. §§ 404.981, 416.1481.

In this action, Byassee first argues that the ALJ's "physical RFC determination is not supported by substantial evidence because the ALJ failed to properly weigh the opinion of treating physician, Steven Douglas M.D. to craft an RFC that is not supported by any opinion and was made up out of whole cloth."   (Doc. 15 at 4.)   Byassee next argues that the ALJ's "mental RFC determination is not supported by substantial evidence because the ALJ failed to properly weigh the opinion of treating physician, Steven Douglas, M.D. as supported by the record including Plaintiff's GAF scores."   *Id.* at 10.

## II.  The ALJ's Determination

The ALJ first found that Byassee meets the insured status requirements of the Social Security Act through March 31, 2021.   (Tr. 12.)   She stated that Byassee has not engaged in substantial gainful activity since her alleged onset date of June 22, 2016.   *Id.*   In addition, the ALJ concluded that Byassee had the following severe impairments:   hepatitis C, generalized anxiety disorder, major depressive disorder, personality disorder, amphetamine abuse with

amphetamine psychosis, PTSD, opiate/heroin abuse, COPD, coronary artery disease/atherosclerotic heart disease, peripheral vascular disease ("PVD"), peripheral neuropathy, osteoarthritis, panic disorder, bipolar disorder, and intermittent left lower extremity claudication status-post bypass.   (Tr. 13.)   The ALJ found that Byassee did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.   *Id.*

As to Byassee's RFC, the ALJ stated:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a range of light work as defined in 20 CFR 404.1567(b) and 416.967(b). Specifically, the claimant is able to lift up to 20 pounds occasionally and lift/carry up to ten pounds frequently.   She is able to stand/walk for about six hours and sit for up to six hours in an eight-hour workday, with normal breaks.   She is unable to climb ladders/ropes/scaffolds, but is occasionally able to climb ramps/stairs, balance, stoop, kneel, crouch, and crawl.   The claimant should avoid even occasional exposure to pulmonary irritants, such as fumes, odors, dust gases, chemicals, and poorly ventilated areas.   She should avoid all exposure to unprotected heights and use of dangerous moving machinery.   She is able to perform simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements, involving only simple work-related decisions and routine workplace changes. She is able to tolerate no direct interaction with the public and only occasional interaction with coworkers.

(Tr. 15.)

The ALJ found that Byassee was unable to perform any past relevant work, but was capable of performing other work existing in substantial numbers in the national economy.   (Tr. 19-20.)   The ALJ therefore concluded that Byassee was not under a disability, as defined in the Social Security Act, from June 22, 2016, through the date of the decision.   (Tr. 21.)

The ALJ's final decision reads as follows:

> Based on the application for a period of disability and disability
> insurance benefits protectively filed on October 18, 2016, the
> claimant is not disabled under sections 216(i) and 223(d) of the
> Social Security Act.
>
> Based on the application for supplemental security income
> protectively filed on October 18, 2016, the claimant is not disabled
> under section 1614(a)(3)(A) of the Social Security Act.

*Id.*

## III.  Applicable Law

### III.A.  Standard of Review

The decision of the Commissioner must be affirmed if it is supported by substantial

evidence on the record as a whole.   42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389,

401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).   Substantial evidence is less

than a preponderance of the evidence, but enough that a reasonable person would find it adequate

to support the conclusion.   *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).   This

"substantial evidence test," however, is "more than a mere search of the record for evidence

supporting the Commissioner's findings."   *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir.

2007) (internal quotation marks and citation omitted).   "Substantial evidence on the record as a

whole . . . requires a more scrutinizing analysis."   *Id.* (internal quotation marks and citations

omitted).

To determine whether the Commissioner's decision is supported by substantial evidence

on the record as a whole, the Court must review the entire administrative record and consider:

1.   The credibility findings made by the ALJ.

2.   The plaintiff's vocational factors.

3.   The medical evidence from treating and consulting physicians.

4.      The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.      Any corroboration by third parties of the plaintiff's impairments.

6.      The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted).   The Court must also consider any evidence which fairly detracts from the Commissioner's decision.   *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999).   However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole.   *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)).   "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision."   *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); s*ee also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).   Put another way, a court should "disturb the ALJ's decision only if it falls outside the available zone of choice." *Papesh v. Colvin*, 786 F.3d 1126, 1131 (8th Cir. 2015) (citation omitted).

## III.B.  Determination of Disability

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to

result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905.   A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience engage in any kind of substantial gainful work which exists … in significant numbers in the region where such individual lives or in several regions of the country."   42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations.   20 C.F.R. § 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).   First, the Commissioner will consider a claimant's work activity.   If the claimant is engaged in substantial gainful activity, then the claimant is not disabled.   20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities."   *Dixon v. Barnhart*, 343 F.3d 602, 605 (8th Cir. 2003).   "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities."   *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs."   20 C.F.R. § 416.921(b).   These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, reaching out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.   *Id*. §

416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141 (1987).   "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on his ability to work."   *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment.   If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience.   20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work.   20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(4).   "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or his physical or mental limitations."   *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. § 416.945(a)(1).   The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources."   20 C.F.R. § 416.945(a)(3).   The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations.   *See id*.   If a claimant retains the RFC to perform past

relevant work, then the claimant is not disabled.   *Id*. § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his age, education, and work experience.   *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n. 5 (8th Cir. 2000).   The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy.   *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 416.920(a)(4)(v).   If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled.   If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled.   20 C.F.R. § 416.920(a)(4)(v).   At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant.   *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.   The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.   *See* 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1).   If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent."   20 C.F.R. §§ 404.1520a(b)(2), 416.920a(b)(2).   The Commissioner must then rate the degree of functional loss resulting from the impairments.   *See* 20 C.F.R. §§ 404.1520a(b)(3), 416.920a(b)(3).   Functional loss is rated on a scale that ranges from no limitation to a level of

severity which is incompatible with the ability to perform work-related activities.   *See id.*   Next, the Commissioner must determine the severity of the impairment based on those ratings.   *See* 20 C.F.R. §§ 404.1520a(c), 416.920a(c).   If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.   *See* 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).   This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.   *See id.*   If there is a severe impairment, but the impairment does not meet or equal the listings, then the Commissioner must prepare an RFC assessment.   *See* 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).

## IV.   Discussion

Byassee argues that the ALJ erred in weighing the opinion of treating physician Dr. Douglas in determining Byassee's RFC.   She claims that, without this opinion evidence, there was insufficient medical evidence to support the RFC determination.

A claimant's RFC is "the most a claimant can do despite her limitations."   *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)).   "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'"   *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)).   "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC."   *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001).   "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace."   *Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir.

2017) (quoting *Steed v. Astrue*, 524 F.3d 872, 875 (8th Cir. 2008)).   However, "[e]ven though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner."   *Cox v. Astrue*, 495 F.3d 614, 619-20 (8th Cir. 2007).

### 1.  Treating Physician Opinion

Byassee argues that the ALJ erred in assigning "little weight" to Dr. Douglas's opinions regarding Byassee's physical and mental limitations.

Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of a claimant's impairment(s), including her symptoms, diagnoses, and prognoses; what she can still do despite her impairments; and her physical and mental restrictions.   20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1) (2017).[1]  The Regulations require that more weight be given to the opinions of treating sources than other sources.   *Willcockson v. Astrue,* 540 F.3d 878, 880 (8th Cir. 2008); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).   A treating source's assessment of the nature and severity of a claimant's impairments should be given controlling weight if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record.   20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Forehand v. Barnhart*, 364 F.3d 984, 986 (8th Cir. 2004).   This is so because a treating source has the best opportunity to observe and evaluate a claimant's condition,

> since these sources are likely to be the medical professionals most able to provide
> a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may

---

[1]In March 2017, the Social Security Administration amended its regulations governing the evaluation of medical evidence.   For evaluation of medical opinion evidence, the new rules apply to claims filed on or after March 27, 2017.   *See* 20 C.F.R. §§ 404.1520c, 416.920c.   Because the claims under review here were filed before March 27, 2017, the Court applies the rules set out in 20 C.F.R. §§ 404.1527 and 416.927.

> bring a unique perspective to the medical evidence that cannot be obtained from
> the objective medical findings alone or from reports of individual examinations,
> such as consultative examinations or brief hospitalizations.

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

When a treating source's opinion is not given controlling weight, the Commissioner must look to various factors in determining what weight to accord that and any other medical opinion of record, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the source provides support for their findings, whether other evidence in the record is consistent with the source's findings, and the source's area of specialty.   20 C.F.R. §§ 404.1527(c), 416.927(c).   The Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion."   20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

Dr. Douglas completed a form titled "Medical Source Statement (Overall Physical & Mental)" on February 21, 2018.   (Tr. 323-25.)   Dr. Douglas stated that Byassee had the following impairments: coronary artery disease, depression, anxiety, psychosis, PVD, and peripheral neuropathy.   (Tr. 323.)   Dr. Douglas indicated that Byassee experiences "moderately severe" pain from her conditions.   (Tr. 324.)   He expressed the opinion that Byassee could occasionally (up to 1/3 of an 8-hour workday) sit; infrequently (very little if at all on some days) stand, walk, and stoop; and could never climb.   (Tr. 323.)   Byassee could occasionally lift up to ten pounds, could infrequently lift 11 to 20 pounds, and could never lift more than 20 pounds. *Id.*   Dr. Douglas indicated that Byassee could occasionally use her hands for fine and gross manipulation and could infrequently raise each of her arms over her shoulder.   *Id.*   With regard to Byassee's mental imitations, Dr. Douglas found that she was capable of understanding and remembering very short, simple instructions; was occasionally precluded from sustaining an

ordinary routine and working in coordination with or proximity to others without being distracted; and was frequently precluded from understanding and remembering detailed instructions, performing activities within a schedule, maintaining regular attendance, adapting to ordinary stress or changes in the workplace, and maintaining attention and concentration for extended periods of time.  *Id.*  He found that Byassee had no limitations in her abilities to interact appropriately with the general public, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness.  (Tr. 324-25.)   Finally, Dr. Douglas indicated that Byassee would miss work four days per month due to her medical conditions.   (Tr. 323.)

The ALJ stated that she was assigning "little weight" to Dr. Douglas's opinion because it was inconsistent with the medical evidence of record.   (Tr. 18.)   The ALJ first addresses Dr. Douglas's opinions that Byassee could occasionally lift or carry ten pounds and sit; could infrequently stand, walk, or stoop; and would be absent from work more than four days a month. The ALJ notes that physical examinations throughout the record reveal that Byassee has a normal gait.  (Tr. 18, 270, 276, 295, 1084, 1125, 1135, 1142.)   In addition, treatment notes from September 2016 indicate that Byassee was ambulating in her room and was able to transfer herself without care.  (Tr. 18, 339.)   The ALJ also cited treatment notes from January 2018, which indicate Byassee had no edema, her gait was normal, and she moved all extremities equally without neurologic deficit.  (Tr. 18, 1084.)   The ALJ next noted that there was no evidence in the record to support the manipulative limitations prescribed by Dr. Douglas.   (Tr. 18.)   Finally, the ALJ stated that she was assigning "little weight" to Dr. Douglas's opinion that

Byassee's ability to adapt to ordinary stress and workplace changes is frequently precluded, "as this limitation is not supported by the medical evidence of record."   (Tr. 18-19.)

The ALJ did not err in finding that some of the limitations set out by Dr. Douglas in his Medial Source Statement were inconsistent with the record.   First, Dr. Douglas's opinions were not supported by his own treatment notes, as summarized below:

Byassee received treatment from Dr. Douglas at Ferguson Medical Group for various impairments from July 2015 through February 2018.   (Tr. 266-300, 1068-1145.)   Byassee complained of backpain in July 2015.   (Tr. 293.)   On examination, she had lumbar pain with palpation and range of motion, but full range of motion in rotation, flexion and extension; normal gait; no weakness or loss of sensation; and negative straight leg raise test.   (Tr. 295.)   Dr. Douglas prescribed Norco[2] and advised Byassee to continue regular activity as tolerated and quit smoking.   (Tr. 296.)   Dr. Douglas also diagnosed Byassee with idiopathic peripheral neuropathy and noted her overall function was improved and her pain was adequately controlled with her treatment plan.   *Id.*   On July 20, 2016—four weeks after Byassee's alleged onset of disability—Byassee presented with complaints of "bad headaches."   (Tr. 285.)   She reported that she "got hooked on Meth and now is seeing and hearing things."   *Id.*   Byassee also complained of back pain, anxiety, depression, and familial stress.   *Id.*   On physical examination, Byassee's neurologic function was intact, her gait was normal, and she moved all extremities equally.   (Tr. 289.)   Byassee's psychological examination revealed a "flat, strange affect," limited judgment and insight, and an actively delusional appearance.   *Id.*   Dr. Douglas diagnosed Byassee with methamphetamine abuse, depression, amphetamine psychosis with

[2]Norco is an opioid pain reliever indicated for the treatment of moderate to severe pain.   *See* WebMD, http://www.webmd.com/drugs (last visited March 24, 2021).

hallucinations, generalized anxiety disorder, chronic headache, and weight loss likely related to methamphetamine use.   (Tr. 289-90.)   He prescribed various psychotropic medications and referred Byassee to Bootheel Counseling.   *Id.*   At her next visit in August 2016, Byassee complained of back pain.   (Tr. 273.)   She was still using methamphetamine.   *Id.*   On examination, she had full range of motion, normal gait, no weakness or loss of sensation, and a negative straight leg raise test.   (Tr. 276-77.)   She continued to exhibit a flat, strange affect and limited insight and judgment, but she no longer appeared delusional.   (Tr. 277.)   Dr. Douglas indicated that Byassee's laboratory testing was positive for hepatitis C.   (Tr. 273.)   Dr. Douglas stated that, although Byassee was a good candidate for treatment, he believed she needed inpatient rehab for narcotic abuse first.   (Tr. 277.)   Dr. Douglas administered trigger point injections for Byassee's lumbar back pain and indicated he would not prescribe narcotic medications.   (Tr. 277-78.)   In September 2016, Byassee reported that she had been clean for three weeks and indicated that she had recently been admitted for her psychiatric symptoms. (Tr. 266.)   She stated that her prescribed pain medication helped her back pain and neuropathy. *Id.*   On examination, Byassee reported pain with palpation of the lumbar paraspinal muscles and with range of motion, but she had full range of motion in rotation, flexion, and extension; her gait was normal; she had no weakness or loss of sensation; she moved all her extremities equally without neurologic deficit; and her straight leg raise test was negative.   (Tr. 270.)   Byassee continued to have a flat, strange affect and limited insight and judgment.   *Id.*   Dr. Douglas administered trigger point injections again to the lumbar spine; and started Byassee on antiviral medication to treat the hepatitis C.   *Id.*   In December 2016, Byassee complained of lower back pain radiating to her left leg, as well as chronic neuropathy and numbness.   (Tr. 1139.)   On examination, Byassee reported pain in the paraspinal muscles with palpation and range of

motion, but had full range of motion in rotation, flexion, and extension; normal gait; no weakness or loss of sensation, and her straight leg raise test was negative.   (Tr. 1142.)   Dr. Douglas administered trigger point injections.   *Id.*   In January 2017, Byassee's biggest complaint was persistent neuropathic pain and lower back pain.   (Tr. 1132.)   Byassee's physical examination findings remained unchanged.   (Tr. 1135-36.)   Dr. Douglas administered trigger point injections.   (Tr. 1136.)   He noted Byassee's hepatitis C had improved with medication. *Id.*   In April 2017, Byassee's physical examination findings remained unchanged.   (Tr. 1125.) On mental examination, Byassee's affect was depressed, but her judgment and insight were appropriate.   *Id.*   Dr. Douglas adjusted Byassee's medications and encouraged her to stop smoking.   (Tr. 1127-28.)   In July 2017, Byassee reported two episodes of syncope without collapse, as well as bilateral lower extremity pain with exertion, chest pain, and shortness of breath.   (Tr. 1105.)   Dr. Douglas adjusted Byassee's medications; ordered arterial studies of her bilateral lower extremities; referred her to a cardiologist; and again urged her to stop smoking. (Tr. 1109-11.)   In August 2017, Byassee reported with complaints of sinus symptoms.   (Tr. 1099.)   She had no interest in smoking cessation.   *Id.*   Dr. Douglas diagnosed her with a sinus infection.   (Tr. 1103.)   In November 2017, Byassee reported "reasonable improvement in pain" with her medication regimen.   (Tr. 1087.)   She complained of cough, wheezing, and numbness and tingling.   (Tr. 1090.)   It was noted that she was still smoking and "has never changed her habits."   (Tr. 1087.)   Dr. Douglas discussed with Byassee strategies for smoking cessation. (Tr. 1091.)   He noted no abnormalities on mental examination.   (Tr. 1091.)   In January 2018, Byassee reported no chest pain or cough, but indicated she has an occasional wheeze.   (Tr. 1080.)   She continued to smoke, did not exercise, and did not watch what she ate.   *Id.*   Upon examination, Byassee's heart and lungs were normal, her neurologic exam was normal, her gait

was normal, she moved all extremities equally, and her mental examination was normal.   (Tr.

1083-84.)   In February 2018, Byassee complained of urinary symptoms, earache, cough, and

congestion, but refused to give a urinalysis.   (Tr. 1071.)   She reported that her depression and

anxiety were better with medication, and that she had started counseling.   *Id.*   Dr. Douglas

diagnosed Byassee with acute bronchitis, tobacco dependence, and improved depression and

anxiety.   (Tr. 1075.)

The ALJ did not err in finding that some of the limitations set out in Dr. Douglas's

Medical Source Statement were inconsistent with his own treatment notes.   With regard to

Byassee's physical limitations, Dr. Douglas found Byassee could only occasionally use her

hands for fine and gross manipulation, yet there is no evidence in the record to support the need

for any manipulative limitations.   In fact, Byassee's attorney even acknowledged at the hearing

that he was not aware of any difficulties Byassee had with her hands and he did not "know where

[Dr. Douglas was] deriving those limitations from."   (Tr. 72.)   Dr. Douglas's opinions that

Byassee is greatly limited in her ability to lift, sit, stand, and walk are also unsupported.   As the

ALJ pointed out, Dr. Douglas consistently noted that Byassee had a normal gait, no edema, and

was able to move her extremities equally without neurologic deficit.   (Tr. 18.)   Byassee's

musculoskeletal examinations were essentially normal, other than occasional pain reported on

palpation and range of motion of the lumbar spine.   These examination findings do not support

the presence of significant postural limitations.   Similarly, Dr. Douglas's treatment notes do not

provide support for his opinion that Byassee would miss four days a month of work due to her

impairments.   An ALJ does not err when she discounts a treating physician's medical opinion

where the opined limitations stand alone and were never mentioned in the physician's numerous

records of treatment.   *Cline v. Colvin*, 771 F.3d 1098, 1104 (8th Cir. 2014); *see also Milam v.*

*Colvin*, 794 F.3d 978, 983 (8th Cir. 2015) (ALJ may discount treating provider's opinion when it is inconsistent with provider's own treatment notes).

Nor does other medical evidence of record support the drastic physical limitations expressed in Dr. Douglas's Medical Source Statement.   The record indicates Byassee was hospitalized from September 16 to 19, 2016, for treatment of an acute urinary tract infection. (Tr. 16, 335, 554.)   On admission, Byassee's respiratory and cardiovascular functions were normal.   (Tr. 541.)   Nursing notes from her admission indicate Byassee was "ambulating in [her] room and can transfer self without care."   (Tr. 339.)   Byassee underwent a CT scan of the chest in October 2016, which revealed the presence of infiltrates.   (Tr. 312.)   At that time, Byassee denied cough or shortness of breath.   *Id.*   It was noted that Byassee smoked one package of cigarettes a day, which aggravated her COPD.   *Id.*   On examination, Byassee's cardiovascular and respiratory functions were normal, other than decreased breath sounds were observed on Byassee's sides.   (Tr. 314.)   Byassee indicated that she did not want an inhaler. (Tr. 315.)   In September 2017, Byassee reported increasing complaints of pain and cramping in the left lower extremity with onset of symptoms three months prior.   (Tr. 626.)   She was diagnosed with left lower extremity claudication and referred for surgery.   *Id.*   Byassee underwent a right femoral to left femoral artery bypass grafting procedure for her left lower extremity claudication and episodic chest pain.   *Id.*   Byassee was discharged two days following surgery, at which time she was ambulating without assistance and had no complaints. (Tr. 627.)   This evidence is not supportive of the long-term physical limitations found by Dr. Douglas.   Instead, it reveals that Byassee underwent a successful surgery for her heart impairment, and received only conservative treatment for her other various impairments.

The medical evidence of record does not support the degree of limitations expressed in Dr. Douglas's Medical Source Statement.

With regard to Byassee's mental limitations, she reported "seeing and hearing things" since she "got hooked on Meth" in July 2016.   (Tr. 285.)   Dr. Douglas's examination revealed a "flat, strange affect," limited judgment and insight, and an actively delusional appearance.   (Tr. 289.)   Dr. Douglas diagnosed Byassee with methamphetamine abuse, depression, amphetamine psychosis with hallucinations, and generalized anxiety disorder.   (Tr. 289-90.)   In August 2016, Byassee continued to exhibit a flat, strange affect and limited insight and judgment, but she was still using methamphetamine.   (Tr. 273, 277.)   Byassee reported that she had been clean for three weeks on September 26, 2016, yet she continued to exhibit a flat, strange affect and limited insight and judgment.   (Tr. 270.)   In January and April of 2017, Byassee was alert and oriented, and her speech, dress, judgment, and insight were appropriate.   (Tr. 1125, 1136.)   Her affect was described as depressed in April 2017.   (Tr. 1125.)   Byassee complained of anxiety in July 2017, but she continued to be alert and oriented, with normal speech, dress, judgment, and insight.   (Tr. 1109.)   In November 2017 and January 2018, Dr. Douglas noted no abnormalities on mental examination.   (Tr. 1084, 1091.)   At her last visit with Dr. Douglas on February 8, 2018, Byassee reported that her depression and anxiety were both better with medication, although she continued to experience symptoms of both.   (Tr. 1071.)   On examination, Dr. Douglas noted a depressed affect, but Byassee was alert and oriented, and her speech, dress, judgment, and insight were appropriate.   (Tr. 1074.)   He diagnosed her with improved depression and anxiety disorder.   (Tr. 1075.)

The ALJ found that Dr. Douglas's opinion that Byassee was frequently precluded from adapting to ordinary stress or changes in the workplace was unsupported by the record.   Dr.

Douglas's treatment notes reveal that Byassee exhibited serious mental symptomatology, including psychosis, when she was using methamphetamine in 2016.   Beginning in January 2017, however, Byassee's mental examinations were normal other than an occasional depressed or anxious affect.   Byassee reported significant improvement in her mental symptoms with prescribed psychotropic medications.   Thus, the ALJ did not err in finding Dr. Douglas's treatment notes do not support the finding that Byassee was frequently precluded from adapting to ordinary stress or changes in the workplace.

The other medical evidence of record reveals that Byassee was hospitalized for psychiatric treatment in September 2016, after reporting hallucinations and using narcotics a few days prior.   (Tr. 561, 564.)   Byassee reported that she had been depressed because her sister just passed away two days prior.   (Tr. 564.)   She indicated that her energy and concentration were okay, and she denied any bipolar symptoms such as racing thoughts.   *Id.*   On examination, she was attentive and friendly, with depressed mood and affect but normal speech, and no evidence of psychomotor agitation or retardation.   (Tr. 565.)   The following month, Byassee saw a psychiatrist at Bootheel Counseling.   (Tr. 303.)   On examination, Byassee displayed a depressed mood and affect and poor judgment and insight, but normal speech, goal-directed thought process.   *Id.*   The psychiatrist adjusted Byassee's medications and encouraged her to "be more engaged in staying clean and keeping busy."   *Id.*   He also referred Byassee to therapy to "work on coping skills, which client sorely needs."   *Id.*   Later that month, an examining physician observed that Byassee was oriented in all spheres, was not anxious, her mood and affect was appropriate, and her judgment was normal.   (Tr. 314.)   Byassee was hospitalized again from December 29, 2016 to January 2, 2017, after relapsing with methamphetamine when her husband left her on Christmas.   (Tr. 782.)   She was acutely delirious and psychotic when

she was brought to the emergency room.  *Id.*   Byassee was treated with medication during her hospital stay, and formulated a plan with family to deal with her marital separation.  *Id.*   It was noted that Byassee "was able to interact pleasantly" during group therapy.  (Tr. 816.)

The medical evidence of record does not provide support for Dr. Douglas's opinion that Byassee would be frequently precluded from adapting to ordinary stress or changes in the workplace.   Rather, the evidence reveals that Byassee experienced brief exacerbations in symptoms due to situational factors and drug usage.   Once Byassee was stabilized on medication, she exhibited only mild symptoms.   Byassee's concentration was never noted to be impaired.   Thus, the ALJ did not err in assigning "little weight" to a portion of Dr. Douglas's opinion.

In sum, the ALJ's determination to discredit some of Dr. Douglas's opinions because of inconsistency with his own treatment notes and with other evidence of record is supported by substantial evidence on the record as a whole, and the ALJ did not err in this determination.  *See Julin v. Colvin*, 826 F.3d 1082, 1088 (8th Cir. 2016) (opinions of treating physicians may be given limited weight if they are inconsistent with the record) (citing *Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015)); *see also Martise v. Astrue*, 641 F.3d 909, 925 (8th Cir. 2011) ("[W]hen a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight.") (internal quotation marks and citation omitted).

### 1.  RFC

Byassee argues that the ALJ's RFC determination is not supported by substantial evidence because it is not supported by any medical opinion and was "made up out of whole cloth."   (Doc. 15 at p. 4.)

Byassee's argument lacks merit.   Consistent with the Eighth Circuit's instructions, the ALJ determined Byassee's RFC by considering "all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations." *Myers v. Colvin*, 721 F.3d 521, 527 (8th Cir. 2013) (quoting *McKinney,* 228 F.3d at 863) (alterations in original).   Accordingly, as described in detail below, the ALJ's RFC determination was not created from "whole cloth"; rather, substantial evidence supports the ALJ's RFC determination.

Byassee testified at the administrative hearing that she spends most days watching television while her husband works.   (Tr. 50.)   She stated that her adult daughter came over each day for about five hours to do Byassee's chores, including cleaning, laundry, meal preparation, and grocery shopping.   (Tr. 41-42, 51, 59.)   Byassee testified that she went to church weekly and was able to sit and stand throughout the two-hour service.   (Tr. 52-53, 59-60.)   She stated that she had difficulty being around "a bunch of people" but was able to interact in small groups.   (Tr. 53.)   Byassee testified that she saw her primary care physician every three months for medication management.   (Tr. 44.)   She indicated that she saw a psychologist or psychiatrist but could not recall the last time she had seen him, and that she was not seeing a therapist.   (Tr. 44, 55.)   Byassee stated that she had not seen her cardiologist since a follow-up appointment one month after her September 2017 surgery.   (Tr. 45-46.)   When the ALJ asked her why she could not work, Byassee testified she "can't stand on [her] legs very long,"   (Tr. 43.)   She indicated that her leg pain improved following surgery.   (Tr. 45-46.)   Byassee further testified that her shortness of breath was "not as bad as it was."   (Tr. 63.)   Finally, Byassee admitted that she continued to smoke.   (Tr. 58.)

The ALJ found that Byassee was capable of lifting up to twenty pounds occasionally and

ten pounds frequently; and standing and sitting for up to six hours of an eight-hour workday,

consistent with light work.   (Tr. 15)   The ALJ found Byassee's RFC was further restricted by

the following additional limitations:

> She is unable to climb ladders/ropes/scaffolds, but is occasionally
> able to climb ramps/stairs, balance, stoop, kneel, crouch, and
> crawl.   The claimant should avoid even occasional exposure to
> pulmonary irritants, such as fumes, odors, dust, gases, chemicals,
> and poorly ventilated areas.   She should avoid all exposure to
> unprotected heights and use of dangerous moving machinery.   She
> is able to perform simple, routine, and repetitive tasks in a work
> environment free of fast-paced production requirements, involving
> only simple work-related decisions and routine workplace changes.
> She is able to tolerate no direct interaction with the public and only
> occasional interaction with coworkers.

*Id.*

The ALJ found that the record was not consistent with Byassee's subjective complaints

of disabling symptoms.  (Tr. 16.)   When determining a claimant's RFC, the ALJ must evaluate

the credibility of the claimant's subjective complaints.  *Wagner v. Astrue*, 499 F.3d 842, 851

(8th Cir. 2007); *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005).

The ALJ found that the degree of physical limitation alleged by Byassee was not

consistent with the medical evidence of record.   (Tr. 16.)   As discussed at length above, Dr.

Douglas consistently found on examination that Byassee had a normal gait, no edema, and was

able to move her extremities equally without neurologic deficit.   Byassee's musculoskeletal

examinations were essentially normal, other than occasional pain reported on palpation and

range of motion of the lumbar spine.   Byassee reported "reasonable improvement" in her

neuropathic pain with medication two months following her bypass surgery.   In January 2018,

Byassee reported no chest pain or cough, no claudication, her gait was normal, and she moved all extremities equally.

Byassee has been diagnosed with COPD and infiltrates were noted on an October 2016 CT scan, yet Byassee denied cough or shortness of breath at that time.   She also declined an inhaler, and continued to smoke despite being advised repeatedly to quit.   In January 2018, she reported an occasional wheeze, but Dr. Douglas noted that she continued to smoke, did not exercise, and did not watch what she ate.   An ALJ may consider a claimant's failure to stop smoking in making her credibility determination.  *Mouser v. Astrue*, 545 F.3d 634, 638 (8th Cir. 2008); *see also Wildman*, 596 F.3d at 968-69 (it is permissible for ALJ to consider claimant's non-compliance with prescribed medical treatment).

The medical evidence of record is inconsistent with the presence of disabling physical impairments.   With the exception of Byassee's heart impairment that was successfully treated with surgery, Byassee has received routine treatment from Dr. Douglas approximately every three months, with minimal findings noted on examination.   Byassee testified that her neuropathic pain and her shortness of breath have improved following surgery.   She also indicated that she is able to sit and stand during two-hour church services.   The medical evidence reveals that Byassee has no difficulty ambulating and has consistently demonstrated a normal gait.   Due to Byassee's credible limitations resulting from her COPD, heart disorder, osteoarthritis, and lower extremity disorder, the ALJ limited Byassee to the exertional requirements of light work with additional postural limitations.   The ALJ also took into account Byassee's COPD in limiting her exposure to pulmonary irritants.   The evidence as a whole, including Byassee's own statements, supports the physical ability to perform a limited range of light work.

The ALJ also found that Byassee's allegation of a disabling mental impairment was not supported by the evidence of record.   As previously discussed, the evidence reveals Byassee experienced psychotic symptoms requiring inpatient hospitalization only when she was using methamphetamine in September and December of 2016.   Beginning in January 2017, Byassee's mental examinations were normal other than an occasional depressed or anxious affect. Byassee reported significant improvement in her mental symptoms with prescribed psychotropic medications.   At Byassee's most recent visit with Dr. Douglas, she reported her depression and anxiety had improved and Dr. Douglas changed her diagnoses to "improved" depression and anxiety.   Byassee admitted at the hearing that she did not see a counselor and could not remember when she had last seen a psychologist or psychiatrist.

Byassee claims that the ALJ's RFC determination was not supported by substantial evidence in the record, because she failed to consider the fact the Global Assessment of Functioning (GAF) scores assigned by Dr. Douglas were consistent with his opinion.   (Doc. 15 at p. 14-15.)   On four separate occasions, between September 17, 2016 and January 27, 2017, Dr. Douglas assigned Byassee a GAF score of between 44 and 50-55.   (Tr. 303, 565, 786, 866.)

The ALJ considered Byassee's GAF scores, as follows:

> While a GAF score is a 'medical opinion' that must be considered with the rest of the relevant evidence, it is of limited use in assessing the severity of a mental impairment for several reasons. GAF scores represent a clinician's judgment about the severity of an individuals symptoms or level of mental functioning at a particular moment in time, much like a snapshot.   They do not provide a reliable longitudinal picture of the claimant's mental functioning.   Moreover, the GAF scale does not directly correlate to the severity requirements in the [SSA]'s mental disorders listings.

(Tr. 19.)

Byassee relies on *Pate-Fires v. Astrue*, for the notion that a history of GAF scores of 50 or below indicate that a claimant has "serious symptoms. . .or any serious impairment in social,

occupational or school functioning…" 564 F.3d 935, 944 (8th Cir. 2009) (citing Diagnostic and

Statistical Manual of Mental Disorders (DSM), at p. 32 (4th Ed. Am. Psychiatric Ass'n 1994)).).

While GAF scores may be an indicator of an individual's level of functioning at a given moment,

*Pates-Fires* did not hold that GAF scores at or below 50 mandate a finding of disability.   *Id*. at

944-945.   And, in any event, the newest edition of the DSM—the fifth edition published in

2013—"dropped the GAF scale as a diagnostic tool because it suffers from a conceptual lack of

clarity and 'questionable psychometrics in routine practice.'" *Mosier v. Colvin*, No. 4:13-06112-

DGK-SSA, 2014 WL 4722288 at *3 (W.D. Mo. Sept. 23, 2014) (unpublished) (quoting the

DSM-5 16).   For more than the last decade, the Eighth Circuit has distanced itself from GAF

scores, indicating an ALJ's complete failure to mention a claimant's GAF scores does not

require reversal.   *Wright v. Astrue*, 489 F.Appx. 147, 149 (8th Cir. 2012).   The Eighth Circuit

has gone so far as to conclude that "GAF scores are of little value."   *Nowling v. Colvin*, 813

F.3d 1110, 1123 (8th Cir. 2016).   The ALJ did not err in electing to assign little weight to

Byassee's GAF scores.

The medical evidence of record is consistent with the ability to perform a limited range of

simple, routine work.   The ALJ limited Byassee to no direct interaction with the public, and

only occasional interaction with coworkers.   In doing so, the ALJ credited Byassee's testimony

that she had difficulty interacting with large groups of people but could interact with small

groups.   The ALJ also incorporated many of the mental limitations found by Dr. Douglas.

The Court finds that the above evidence constitutes substantial evidence, including

medical evidence, to support the RFC assessment.   It was appropriate for the ALJ to discuss and

evaluate the objective medical evidence in evaluating Byassee's RFC.   *See* 20 C.F.R. §

404.1529(c)(2) ("Objective medical evidence...is a useful indicator to assist us in making

reasonable conclusions about the intensity and persistence of your symptoms and the effect those symptoms, such as pain, may have on your ability to work.").   The ALJ considered the objective medical evidence along with the opinion evidence, the evidence regarding Byassee's conservative treatment, and Byassee's own statements regarding her limitations and daily activities.   In her discretion, the ALJ made an RFC finding that did not precisely reflect any of the medical opinions of record.   *See Martise*, 641 F.3d at 927 (ALJ is not required to rely entirely on one particular physician's opinion or choose between opinions).   A restriction to a limited range of light, simple work adequately accounts for Byassee's combination of physical and mental impairments.   Byassee has failed to demonstrate that the ALJ's decision was outside the available "zone of choice."

Accordingly, Judgment will be entered separately in favor of Defendant in accordance with this Memorandum.


/s/ Abbie Crites-Leoni
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 29th day of March, 2021.